NIGHT BOX
FILED

OCT 06 2000

CLERK, USDC / SDFL / WPB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6211-CR-HURLEY/VITUNAC

UNITED STATES OF AMERICA )
)
)
)
v. )
)
ZUHAIR RABEI, )
SABER ABDELMUTI, )
AHMAD ALMASRI, )
and )
NADIA ALMASRI, et al. )
)
Defendants. )
_____ )

**GOVERNMENT'S RESPONSE TO THE STANDING DISCOVERY ORDER**

The United States hereby files this response to the Standing Discovery Order. This response also complies with Local Rule 88.10 and Federal Rule of Criminal Procedure 16, and is numbered to correspond with Local Rule 88.10.

    A.    1.    Audio/video recordings of statements made by the defendants can be obtained by making arrangements with undersigned counsel. A total of 16 videotapes and 2 audiotapes are available for inspection at the Discovery Conference.

2. That portion of the written record containing the substance of any oral statements made by the defendants before or after arrest in response to interrogation by any person then known to the defendant to be a government agent will be provided at the Discovery Conference.

The following is the substance of oral statements made by the defendants before or after arrest in response to interrogation by any person then known to the defendant to be a government agent which the government intends to use at trial:

After Narog was arrested, he spoke with agents. Narog claimed that what he did was completely legitimate. Narog also claimed that he had only one domestic customer, Impact Sales, but that he had made several sales to them. When told that agents had videotaped several other distributions of pseudoephedrine to other individuals (not Impact Sales), Narog had no explanation. After arrest, Narog was asked why he lied during a July, 2000 meeting with investigators who were discussing his export license. At that meeting, Narog stated Seaside Pharmaceuticals had no pseudoephedrine in its possession as of the July meeting. Narog also stated that Unit 1352 was the only storage warehouse that Seaside Pharmaceuticals had. After arrest, Narog admitted that Seaside Pharmaceuticals did have pseudoephedrine at the time of that interview and that Seaside Pharmaceuticals had other storage units. Narog, through his attorney admitted that he had lied to investigators in that July, 2000 interview. When asked what was the purpose for a "legitimate pseudoephedrine distributor" to lie about having additional warehouses and to lie about having legitimate additional pseudoephedrine, Narog could not provide an explanation.

When Mohammed Samhan was arrested, he was asked if he had any pseudoephedrine in his home. Samhan told agents that he had two cardboard boxes in the house that contained pseudoephedrine. (The total weight of the loose pills in two boxes was approximately 144 pounds).

After Ghandi Jaber was arrested he spoke to agents. He advised them that he was a permanent resident and that he moved to South Florida from

2

Chicago several years ago. He advised that he had a passport and residence papers but that they were in a safe deposit box belonging to his cousin, Samir Alsharif. Jaber advised that he is the part owner of the Pita Inn with his cousin Alsharif. Jaber also advised that he currently worked with his cousin Alsharif at the Kwik Stop located at 2200 Seacrest Boulevard, Delray Beach. He indicated that he made approximately $2,000 a month working at the Kwik Stop. Jaber also stated that he paid $900 a month rent for his apartment and that his wife Amy Osman does not work. Jaber stated that he has known Narog for approximately 1 year and has worked for him for approximately 6 months. He met Narog at the Kwik Stop where Narog used to sell cigarettes. Jaber advised that he made deliveries of medicine to customers of Narog. Jaber said he did not know Narog's customers prior to any deliveries of medicine he made for Narog. Jaber also advised that he translated for Narog because Narog dealt with individuals from the Middle East who did not speak English well. Jaber advised that Narog paid him approximately $500 a month and that Narog did trading overseas. Jaber said he did not know what the medicine was being used for and that he only made deliveries of medicine to individuals that Narog told him to. Jaber also advised that he did not rent or own any other property.

When Jaber and Samhan were arrested and being booked, Jaber was asked if he knew Samhan. Jaber stated that he had never seen Samhan before. Samhan stated that he had never seen Jaber before.

When agents executed a search warrant on a townhouse in Delray Beach, they observed Nabil Aquil, Nizar Fneiche and Raed Aldin (among others) on numerous occasions entering and exiting the townhouse. When a vehicle stop was conducted, Aldin said he did not know Fneiche or Aquil. Aquil and Fneiche, who were stopped driving in another vehicle, advised agents that they were both in town from Chicago and were staying at a hotel on the beach. However, neither Aquil nor Fneiche could provide the name or location of the hotel. Aquil and Fneiche denied knowing anything about the activities at the townhouse and denied ever being at the townhouse.

When Defendant ZUHAIR RABEI was detained on or about April 27, 2000, he advised Special Agents that he was in the Lakeland area on business. He stated that he had just driven down from Perry, Florida. He stated that he was a store owner in Texas and that he owned numerous stores throughout Texas. He stated that he was staying in the Lakeland area with friends. When RABEI was arrested on or about August 3, 2000, he made statements to law enforcement officials about his involvement in this matter, a copy of which is attached.

On or about April 27, 2000, law enforcement officials stopped Defendant ABDELMUTI while driving his vehicle. He was asked about boxes of pseudoephedrine that were found in his vehicles. ABDELMUTI advised that he knew the boxes contained medicine. ABDELMUTI also advised that he heard AHMAD ALMASRI in the past state that the medicine was used to make drugs. ABDELMUTI advised that he had heard this conversation at ALMASRI's residence. A copy of that statement is attached.

When AHMAD ALMASRI was detained he stated at first that he thought the boxes (of pseudoephedrine) contained candy. When he found out that the boxes contained some type of medicine, he called ABDELMUTI and told him to remove the boxes from the garage. He told the agents that earlier in the morning he received a phone call from "Mike" who lives in Winter Haven. Mike asked him to store the boxes in the garage for him, telling him that the boxes contained candy. After the boxes were delivered, AHMAD ALMASRI went with the driver in the van to a shipping center in Tampa. They purchased boxes from the shipping center and packaged several of the "candy" boxes into the shipping boxes they purchased. They then shipped the boxes to a location that ALMASRI did not know. At that time, ALMASRI learned that the boxes contained medicine and not candy and he telephoned ABDELMUTI and told him to remove the boxes from his garage. He then gave agents a telephone number and business card for Mike. A copy of a report reflecting that statement is attached.

When NADIA ALMASRI was questioned on April 27, 2000, she told the agents that she had no knowledge of the boxes or the contents. She stated that she was willing to talk to the agents and

4

that she would answer any questions. She stated that she did not have any drugs, money or illegal items in her residence. She gave oral consent to search her residence but wanted to be present during the search. She told agents that she had been home for a majority of the day and had not departed. She initially stated that no one had visited her at the residence and that her husband was at his place of employment. When asked if she was familiar with a green Bronco that may have visited the residence earlier in the day, NADIA ALMASRI replied that no one driving a green Bronco had visited her. Her husband's business partner, SABER ABDELMUTI, had visited her driving a blue ambulance type vehicle. NADIA ALMASRI told agents that ABDELMUTI and her husband had been business partners for approximately 10 years. She said that ABDELMUTI had come over to find her husband. NADIA ALMASRI stated that ABDELMUTI departed immediately after he was informed that her husband was not present. When asked if ABDELMUTI had picked up or dropped off any object while visiting the residence, NADIA ALMASRI replied no. NADIA ALMASRI further stated that she was certain that no objects had been picked up or dropped off at the residence. NADIA ALMASRI told agents that she had been in the United States for four years and that she was originally from Jordan. NADIA ALMASRI stated that she understood the English language and was not currently under the influence of drugs or alcohol. A copy of the report reflecting the statement is attached.

3. No defendant testified before the Grand Jury.

4. The NCIC record of the defendants will be made available at the Discovery Conference.

5. Books, papers, documents, photographs, tangible objects, buildings or places which the government intends to use as evidence at trial to prove its case in chief, or were obtained or belonging to the defendants may be inspected at a mutually convenient time at the Office of the United States Attorney, 500 East Broward Boulevard, Suite 700, Fort Lauderdale, FL 33394. Some of the items available for inspection include photographs,

    videotapes, and other documentation. Items seized from Narog's home, items seized from the Shurgard Warehouse where the pseudoephedrine was stored will be available for inspection. Please call the undersigned to set up a date and time that is convenient to all parties.

6. There were no physical or mental examinations or scientific tests or experiments made in connection with this case, with the exception of the DEA Laboratory analyzing a portion of the millions of pills seized, and a fingerprint analysis of some of the items seized from a search warrant at 704 Broughton Circle. A laboratory analysis of the substance seized in connection with this case will be made available. A copy of the fingerprint analysis will be made available at the Discovery Conference.

B. DEMAND FOR RECIPROCAL DISCOVERY: The United States requests the disclosure and production of materials enumerated as items 1, 2 and 3 of Section B of the Standing Discovery Order. This request is also made pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.

C. The government will disclose any information or material which may be favorable on the issues of guilt or punishment within the scope of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

D. The government will disclose any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective government witnesses, within the scope of <u>Giglio v. United States</u>, 405 U.S. 150 (1972), or <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).

E. The government will disclose any prior convictions of any alleged co-conspirator, accomplice or informant who will testify for the government at trial.

F. No defendant was identified in a lineup, show up, photo spread or similar identification proceedings.

G. The government has advised its agents and officers involved in this case to preserve all rough notes.

H. The government will timely advise the defendant of its intent, if any, to introduce during its case in chief proof of evidence pursuant to F.R.E. 404(b). You are hereby on notice that all evidence made available to you for inspection, as well as all statements disclosed herein or in any future discovery letter, may be offered in the trial of this cause, under F.R.E. 404(b) or otherwise (including the inextricably-intertwined doctrine).

I. The defendants are not aggrieved persons, as defined in Title 18, United States Code, Section 2510(11), of any electronic surveillance.

J. The government has ordered transcribed the Grand Jury testimony of all witnesses who will testify for the government at the trial of this cause.

K. The government will, upon defense request, deliver to any laboratory presently registered with the Attorney General in compliance with 21 U.S.C. § 822 and § 823 and 21 C.F.R. 1301.13, a sufficient representative sample of the pseudoephedrine which is the subject of this indictment to allow independent chemical analysis of such sample.

L. If you wish to inspect the 4 vehicles (a Mercedes, a Buick, an Explorer and a Land Cruiser), used in the commission of the offense charged, please contact the undersigned.

M. A latent fingerprint found from items seized from the townhouse at 704 North Broughton Circle, Building 6, Boynton Beach, Florida has been identified as that of the defendant, Nabil Aquil. A copy of the latent fingerprint report will be made available at the Discovery Conference.

N. To date, the government has not received a request for disclosure of the subject-matter of expert testimony that the government reasonably expects to offer at trial.

O. The government will make every possible effort in good faith to stipulate to all facts or points of

7

        law the truth and existence of which is not contested and the early resolution of which will expedite trial. These stipulations will be discussed at the discovery conference.

P.    At the discovery conference, the government will seek written stipulations to agreed facts in this case, to be signed by the defendant and defense counsel.

    The government is aware of its continuing duty to disclose such newly discovered additional information required by the Standing Discovery Order, Rule 16(c) of the Federal Rules of Criminal Procedure, <u>Brady</u>, <u>Giglio</u>, <u>Napue</u>, and the obligation to assure a fair trial.

    In addition to the request made above by the government pursuant to both Section B of the Standing Discovery Order and Rule 16(b) of the Federal Rules of Criminal Procedure, in accordance with Rule 12.1 of the Federal Rules of Criminal Procedure, the government hereby demands Notice of Alibi defense; the approximate time, date, and place of the offense was:

        Time:  See indictment
        Date:  See indictment
        Place: See indictment

                      Respectfully submitted,

                      GUY A. LEWIS
                      UNITED STATES ATTORNEY

                      By: _____
                      LAURENCE M. BARDFELD
                      Assistant U.S. Attorney
                      Federal Courthouse
                      500 East Broward Blvd., #700
                      Ft. Lauderdale, Florida 33394
                      (954) 356-7255, Fax: 356-7228
                      Fla. Bar No. 712450
                      E-Mail:Laurencebardfeld@justice.usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed/hand-delivered this 5th day of October, 2000, to: Mark NeJame, Esquire, One South Orange Avenue, Suite 304, Orlando, FL 32801, and Randee Golder, P.O. Box 3756, Boynton Beach, FL 33424-3756, and Theodore Weeks, IV, Esquire, One Lake Morton Drive, Post Office Box 3, Lakeland, Florida, 22802-003.

LAURENCE M. BARDFELD
ASSISTANT U.S. ATTORNEY

3. RABEI stated that he had moved to Houston from Perry, Florida, on June 12, 2000. RABEI stated he had owned a convenience store called COUNTRY KITCHEN, 1305 W. Highway 98, Perry, Florida prior to moving to Houston. RABEI moved into a house in Houston located at 13720 Sablecrest, Houston, TX which is owned by Iklass BAZAAR, who currently resides in the US Virgin Islands.

4. DI Vanover asked RABEI if he had ever sold any products containing pseudoephedrine when he owned his store. He stated he only sold Magnum 357 and sold it to students, and was familiar with pseudoephedrine. DI Vanover asked RABEI if he had ever purchased or shipped a large order of pseudoephedrine from Florida to California. RABEI stated that in April of 2000, he received a call from a man named Mike LNU. RABEI stated "Mike" lived in Ft. Lauderdale which was approximately 200 miles south of Perry, Fl. "Mike" asked RABEI if he would let him (Mike) use his credit card to rent a van to transport some "vitamins" to a new storage location. RABEI stated he had never met "Mike", but agreed to rent a van and drive it down to Ft. Lauderdale. DI Vanover asked RABEI how Mike had gotten his phone number and RABEI stated he didn't know.

5. RABEI stated that after renting the van he drove the van to a location near the airport in Lakeland, FL and met a man name "Jim" LNU and Mike. DI Vanover asked if RABEI could provide a physical description of the men and RABEI stated they were Palestinian.

6. RABEI continued and said once he arrived, Mike and Jim took the van while RABEI waited at a residence. RABEI said Mike and Jim took the van to a storage location, loaded the van with the "vitamins", took them to another location, emptied the van and returned the van empty to RABEI. DI Vanover asked RABEI if he had done this before and RABEI said, "no". DI Vanover asked RABEI if he thought it was odd to receive a telephone call from a complete stranger who asked him to rent a van on his (RABEI's) credit card, drive the van 200 miles south of his home and then turn the van over to these strangers for them to use however they wanted; then, after the strangers used the van he was asked to drive the van back to his home 200 miles north and return it to the rental company. RABEI said it was not odd. RABEI also said that on his way back to his home he was stopped by the police and given a traffic ticket after the police looked inside the van. RABEI was asked if he had participated in the activity of moving the "vitamins" and he said he had not.

At the conclusion of the interview, RABEI continued to deny any activity involving pseudoephedrine and said he had only rented the van for Mike and Jim.

31. Following the stop of the blue Ford Ranger truck being driven by ABDELMUTI and occupied by ALMASRI, interviews were conducted of each individual. Sgt. Michael Pruitt (Polk County Sheriff's Office) asked ABDELMUTI if there were any narcotics in the vehicle to which ABDELMUTI replied no. SGT. Pruitt asked ABDELMUTI if there was anything in the ambulance parked at B&J Market to which ABDELMUTI replied there was medicine. ABDELMUTI consented to a search of the ambulance and gave Sgt. Pruitt the key to the ambulance.

32. Sgt. Pruitt responded to the B&J Market and met with TFA O'Connor, S/A Leclair and G/S Randerson to conduct a search of the blue ambulance. The ambulance, bearing Florida tag IN347C, was parked and unattended. A search of the ambulance was conducted and 58 boxes of Tru Choice Maxim pseudoephedrine were recovered. Each box contained 48 bottles. Each bottle contained 60 count, 60 mg. tablets, Lot #00D017. Sgt. Pruitt maintained custody of the pseudoephedrine for safekeeping. The pseudoephedrine was placed into the Polk County Sheriff's Office property/ evidence section.

33. After the pseudoephedrine was recovered from the blue ambulance type vehicle at the B&J Market, ABDELMUTI agreed to a consent search of the green Ford Bronco and his residence located at 432 South Road, Lakeland, Florida. A search of the green Ford Bronco at the residence was conducted and 100 boxes of Tru Choice Maxim pseudoephedrine were recovered. Each box contained 48 bottles. Each bottle contained 60 count, 60 mg. tablets, Lot #00D017. Sgt. Pruitt maintained custody of the pseudoephedrine for safekeeping. The pseudoephedrine was placed into the Polk County Sheriff's Office property/evidence section. TFA O'Connor spoke briefly with ABDELMUTI at the residence. ABDELMUTI advised he knew the boxes contained medicine. ABDELMUTI also advised that he has heard ALMASRI in the past state this medicine is used to make drugs. ABDELMUTI advised he heard this conversation at ALMASRI's residence.

INTERVIEW WITH SABER, HE ADVISED THAT F AND AL-MASRI ARE OWNERS OF THE B & J FOOD STORE. CONCERNING THE BOXES THAT WERE REMOVED FROM AL-MASRI'S RESIDENCE, SABER STATED THAT AL-MASRI CALLED HIM AND TOLD HIM TO GO TO THE RESIDENCE AND REMOVE THE BOXES FROM HIS GARAGE. SABER GAVE PERMISSION TO SEARCH THE FORD AMBULANCE THAT WAS STILL LOCATED AT THE B & J FOOD STORE. SABER WAS ASKED WHAT WAS IN THE BOXES AND HE IDENTIFIED THE CONTENTS AS MEDICINE.

AL-MASRI FIRST STATED THAT HE THOUGHT THE BOXES CONTAINED CANDY. WHEN HE LEARNED THAT THAT IT WAS SOME TYPE OF MEDICINE, HE CALLED SABER AND TOLD HIM TO REMOVE THE BOXES FROM HIS GARAGE.

I FOLLOWED AL-MASRI TO HIS RESIDENCE ON FENTON WAY TO SPEAK WITH HIM AND HIS WIFE. WHILE AT THE RESIDENCE, AL-MASRI TOLD ME THE FOLLOWING.

AL-MASRI TOLD ME THAT EARLIER THAT MORNING, HE RECEIVED A PHONE CALL FROM "MIKE", WHO LIVES ON SHARON HILL CRT IN WINTER HAVEN. HE SAID THAT MIKE ASKED HIM TO STORE THE BOXES IN HIS GARAGE FOR HIM, TELLING HIM THAT THE BOXES CONTAINED CANDY.

AFTER THE BOXES WERE DELIVERED, HE WENT WITH THE DRIVER IN THE VAN TO A SHIPPING CENTER IN TAMPA. THEY PURCHASED BOXES FROM THE SHIPPING CENTER AND PACKAGED SEVERAL OF THE CANDY BOXES INTO THE BOXES THEY PURCHASED. HE SAID THEY THEN SHIPPED THE BOXES TO A LOCATION THAT HE DID NOT KNOW. HE SAID THAT
(continued

------------------------------ Narrative (continued) ------------------------------

IT WAS AT THIS POINT THAT HE LEARNED THE BOXES CONTAINED MEDICINE AND NOT CANDY, SO HE TELEPHONED SABER AND TOLD HIM TO REMOVE THE BOXES FROM HIS GARAGE.

AL-MASRI STATED THAT MIKE'S PHONE NUMBER WAS 965-7187 AND HIS CELL PHONE NUMBER WAS 289-0067. WHILE SPEAKING WITH AL-MASRI ABOUT MIKE, AND TRYING TO GET MIKE BETTER IDENTIFIED, AL-MASRI PRODUCED A BUSINESS CARD STATING THE CARD BELONGED TO MIKE. THE CARD NOTED THE BUSINESS OF "VIVA MEXICO" LOCATED AT 1685 HINSON AV., HAINES CITY, FLORIDA. THE NAME ON THE CARD WAS MIKE KUDAH, IDENTIFYING MIKE AS THE OWNER.

NADIA AL-MASRI, W/F, 11-21-64, SPOUSE OF AHMAD, STATED THAT SHE DID NOT HAVE ANY KNOWLEDGE OF THE BOXES OR THE CONTENTS.

---------- Narrative (continued) ----------

STOPPED. I ASKED ABDELMUTI IF HE HAD ANY NARCOTICS IN THE RANGER AND HE SAID NO. I ALSO ASKED HIM IF THERE WAS ANYTHING IN THE AMBULANCE AND HE SAID THERE WAS MEDICINE. I ASKED FOR CONSENT TO SEARCH THE AMBULANCE AND ABDERMUTI AGREED GIVING ME THE KEY TO THE VEHICLE. INSIDE THE VEHICLE WE LOCATED 58 BOXES OF EPHEDRINE. THIS WAS PHOTOGRAPHED AND LATER PLACED INTO EVIDENCE.

I THEN RETURNED TO THE LOCATION OF THE TRAFFIC STOP AND ASKED ABDELMUTI IF HE HAD ANY MORE BOXES OF MEDICINE AT HIS RESIDENCE. HE STATED THAT HE HAD SOME IN THE BACK OF HIS BRONCO. HE AGREED TO ACCOMPANY ME TO HIS HOUSE TO LOOK AT THE BOXES. MYSELF AND DET. ASHLEY AND TFA T. LOVETTE (DEA - TAMPA) RESPONDED TO THE RESIDENCE LOCATED AT 670 SOUTH RD. AT THE RESIDENCE, ABDELMUTI AGREED TO LET US SEARCH HIS RESIDENCE AND HE ALSO SHOWED US THE BRONCO FILLED WITH BOXES OF EPHEDRINE.

ABDELMUTI SAID THAT AL-MASRI CALLED HIM AND ASKED HIM TO PICK UP THE BOXES FROM HIS HOUSE AND KEEP THEM FOR HIM. HE SAID THAT AL-MASRI TOLD HIM HE HAD BELIEVED IT WAS CANDY, BUT WHEN HE FOUND OUT IT WAS MEDICINE, HE DIDN'T WANT IT AT HIS HOUSE. ABDELMUTI SAID THAT HE HAD ONLY BEEN BACK FROM JORDAN ABOUT A WEEK AND THAT HE HAD BEEN IN JORDAN WITH HIS SICK DAD (HEART PROBLEMS) FOR SEVERAL MONTHS.

1. On April 27, 2000 agents of the Orlando District Office assisted the Fort Lauderdale District Office in a surveillance operation involving the shipment of pseudoephedrine from Ft. Lauderdale to Lakeland, Florida.

2. On this date, at approximately 6:06 pm, SA's Baer, O'Rourke, Hegarty and Blanton made contact with a female identified as Nadia Abed ALMASRI in the vicinity of 925 Fenton Lane, Apartment #4, Lakeland, Florida. ALMASRI was visiting a neighbor and was not present inside the apartment. Agents observed ALMASRI to be wearing a purple long-sleeve shirt, a dark blue skirt and a scarf which covered her hair. During the consensual encounter with ALMASRI, SA O'Rourke identified himself as a police officer and inquired if she would be willing to talk to agents. ALMASRI replied that she would talk to agents and was willing to answer any questions. ALMASRI related that she did not have any drugs, money or other illegal items currently located inside her residence. Next, ALMASRI provided oral consent for agents to search her residence, and indicated that she would like to be present during the search. ALMASRI then accompanied the aforementioned agents inside the residence and a search was conducted. A search of the residence was negative for any items, including drugs (pseudoephedrine), currency or other contraband items.

3. During the search of the residence, ALMASRI told SA Baer the following:

    ALMASRI told SA Baer that she had been home for the majority of the day and had not departed. ALMASRI initially stated that no one had visited her at the residence and that her husband, Ahmed ALMASRI, was at his place of employment, B & J MARKET/ GROCERY STORE. SA Baer asked ALMASRI if she was familiar with a green Bronco that may have visited the residence earlier in the day. ALMASRI replied that no one driving a green Bronco has visited her, but that her husband's business partner, Saber ABDELMUTI, had visited her driving a blue ambulance type vehicle. According to ALMASRI, ABDELMUTI and her husband have been business partners for approximately ten years. ALMASRI indicated that the purpose of ABDELMUTI's visit was to locate her husband. According to ALMASRI, ABDELMUTI visited the residence and departed immediately thereafter once ALMASRI informed ABDELMUTI that her husband was not present. SA Baer inquired if ABDELMUTI picked up or dropped off any object while visiting the residence, and ALMASRI replied no. ALMASRI further stated that she was certain that no objects had been picked up or dropped off at the residence. ALMASRI told SA Baer that she had been in the United States for approximately four years and was originally from Jordan. ALMASRI told SA Baer that she understood the English language and was not presently under the influence of drugs or alcohol.